IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| TAMI R. RUIZ, | ) |
| | ) |
|         Plaintiff, | ) |
| | ) |
| vs. | )   Civil No. 14-cv-431-CJP[1] |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social | ) |
| Security, | ) |
| | ) |
|         Defendant. | |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), *pro se* plaintiff Tami R. Ruiz seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for benefits in July, 2009, alleging disability beginning on December 31, 2007. (Tr. 187). After holding an evidentiary hearing, ALJ Joseph L. Warzycki denied the application in a written decision dated May 13, 2011. (Tr. 187-196). The Appeals Council vacated the decision and remanded for further proceedings. The Appeals Council directed the ALJ to consider third-party statements that had been submitted in support of plaintiff's application and to give further consideration to plaintiff's maximum RFC. (Tr. 203-204).

ALJ Warzycki then held two more hearings, and denied the application in a

---

[1] This matter was referred to the undersigned for final disposition upon consent of the parties, pursuant to 28 U.S.C. §636(c). See, Doc. 14.

decision dated November 8, 2012. (Tr. 24-32). The Appeals Council denied review and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff's brief, Doc. 18, raises the following points:

1. The ALJ allegedly said he would rule in plaintiff's favor if the date of onset was amended. Plaintiff's representative proposed an amended onset date, but the ALJ did not rule in her favor.

2. The ALJ stated at the August, 2012, hearing that he wanted to have two more examinations performed, but these were not done.

3. The majority of the expert witnesses agreed that plaintiff had fibromyalgia and that she was therefore unemployable. The ALJ kept calling new expert witnesses until he got one to agree with his personal opinion.

4. The ALJ dismissed the third party statements and the opinions of her treating doctors as not credible, even though the third parties and treating doctors are the ones who know her best.

5. Dr. Rose, who specializes in treating fibromyalgia, stated that all 18 trigger points were positive.

## Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). For a DIB claim, a claimant must establish that he was

disabled as of his date last insured.  *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  42 U.S.C. §423(d)(3).  "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.  20 C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.  The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of

3

the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.   20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009.

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.  If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job.  *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th  Cir. 1984).  *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   It is important to recognize that the scope of review is limited.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).  Thus, this Court must determine not whether Ms. Ruiz was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether

4

any errors of law were made. See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971). In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### **The Decision of the ALJ**

It is necessary to consider both of the decisions because ALJ Warzycki adopted parts of his first decision in his second decision.

ALJ Warzycki followed the five-step analytical framework described above. He determined that plaintiff was insured for DIB only through December 31, 2010. The ALJ found that plaintiff had severe impairments of fibromyalgia, hypertension, diabetes, migraines, sleep apnea, gastritis, obesity, major depressive disorder, anxiety disorder and history of Bell's palsy. He further determined that these impairments do not meet or equal a listed impairment.

In his second decision, the ALJ found that Ms. Ruiz had the residual functional capacity (RFC) to perform sedentary work with no climbing of ropes, ladders, or scaffolds, limited to only occasional climbing of ramps and stairs and

5

only occasional balancing, stooping, kneeling, crouching, and crawling, and no concentrated exposure to unprotected heights or dangerous moving machinery. She was further limited to simple, routine, repetitive tasks with only infrequent changes in work settings and processes, and only occasional interaction with co-workers, supervisors and the general public.

Based on the testimony of a vocational expert, the ALJ found that plaintiff was able to do jobs which exist in significant numbers in the national and local economies. Therefore, he concluded that she was not disabled during the relevant time period.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period.

### 1. Agency Forms

Plaintiff was born in 1969, and was 38 years old on the alleged onset date of December 31, 2007. She was insured for DIB through December 31, 2010. (Tr. 434). In July, 2009, she was 5 feet tall and weighed 240 pounds. (Tr. 423).

Plaintiff said she was unable to work because of a number of conditions, including fibromyalgia, obesity and depression. She said she stopped working on December 31, 2007. (Tr. 424).

Plaintiff had worked at a number of jobs. She was an on-site reviewer for a staffing agency, a consultant for a home party candle company, a school playground

6

supervisor, and a school bus driver. (Tr. 425).

Agency earnings records show that plaintiff had no reported earnings in 2002 or 2003. She made less than $5,000 in 2000, 2001, 2004 and 2007, and less than $10,000 in 2005 and 2006. The most money she ever earned in a year was $11,261.76 in 1997. (Tr. 410).

Ms. Ruiz filed a Function Report in August, 2009. She said that she did not do much on a daily basis. She napped while her children were at school, and got up when her husband came home from work. She went to the YMCA to swim. Her husband and children did most of the cooking and housework. She did laundry, but someone else had to carry the laundry baskets up and down the stairs. On most days, she was in so much pain she could not move. (Tr. 462-473).

In December, 2009, after her claim was initially denied, she filed another report in which she stated she was having more pain and anxiety attacks. Daily activities were harder because of her pain. (Tr. 476-483).

 2. **Evidentiary Hearings**

Plaintiff was represented by a nonattorney representative from the Shaw Group at the first hearing. (Tr. 129, 235). She was represented by an attorney from the Shaw Group at the second two hearings, (Tr. 41, 103).

At the first hearing, in April, 2011, plaintiff testified that she lived with her husband and two young adult children. (Tr. 134-135). She had health insurance through her husband's job. (Tr. 136). She had graduated from high school and had a certificate in medical assistance. (Tr. 137). She did very little housework or cooking. She had to use a motorized cart in stores. She mostly watched TV all

day. She sometimes read or used a computer to play simple games or send email. She was no longer able to swim at the YMCA   (Tr. 144-147).

She took Cymbalta for fibromyalgia symptoms and hydrocodone for pain. (Tr. 151-142).   Cymbalta caused forgetfulness and confusion.   (Tr. 167).

She had depression and anxiety. (Tr. 160-161).   She was not seeing a mental health specialist.   (Tr. 163).

Plaintiff testified that she could only sit for a short time and then had to get up and move around.   She could stand for only five minutes.   She could walk only from the front door to the mailbox and back.   (Tr. 164-165).   She had no energy. (Tr. 167).   She said her condition had gotten worse since she stopped working in December of 2007.   (Tr. 171).

The second hearing took place in August, 2012, after the Appeals Council remand.  (Tr. 43).   Dr. Alan Kravitz testified as an independent medical expert. He is board certified in internal medicine and cardiology.   (Tr. 324).   Dr. Kravitz testified that plaintiff's most significant medical impairment was fibromyalgia. (Tr. 47).   In his opinion, her condition equaled a listed impairment in the 1.00 series, impairments of the musculoskeletal system.   He noted that fibromyalgia is not a listed impairment.   He also testified that he did not know how many positive trigger points she had.   (Tr. 48-49).

Plaintiff also testified at the second hearing.   The ALJ and her attorney asked her a number of questions, but the questioning was not directed to the period before her date last insured, December 31, 2010.

A vocational expert also testified.   The ALJ asked a hypothetical question

that corresponded to the ultimate RFC findings, set forth above. The VE testified that this person could not do plaintiff's past work but she could do other jobs such as stuffer, eyeglass polisher and document preparer. (Tr. 94-97).

The third hearing took place in October, 2012. (Tr. 105). Dr. Malcolm Brahms testified as a medical expert. He is a board certified orthopedic surgeon. (Tr. 366). Dr. Brahms testified that plaintiff's impairments did not meet or equal any of the listings. He felt she could do light work. (Tr. 110-111).

Kathleen O'Brien, Ph.D., a board certified psychologist, also testified as a medical expert. She testified that the medical records did not contain an established mental diagnosis, but there were indications of depression. She noted that it is common to have "an emotional component" in fibromyalgia. (Tr. 120). She testified that plaintiff's mental impairments did not meet or equal a listed impairment. In her opinion, plaintiff had only mild limitations arising from her mental impairments. (Tr. 121). She did not see any indication in the records that plaintiff was unable to do simple work. (Tr. 124).

### 3. Third Party Statements

The record contains letters from plaintiff's husband, mother, daughter, and two friends. The letters are dated February and March, 2011. These letters state that plaintiff is unable to do much, suffers from pain and fatigue, must use a wheelchair when she goes out, and sometimes stays in bed all day. (Tr. 499-504).

### 4. Medical Treatment

David O'Neill, D.O., has been plaintiff's primary care physician since at least December, 2001. (Tr. 702). His office notes are brief, handwritten and difficult

9

to read.

In January, 2007, she was prescribed Byetta, a drug used to control blood sugar in patients with Type II diabetes. See, www.drugs.com/pro/byetta, accessed on March 31, 2015. (Tr. 687). The records contain references to pain and fatigue in September and October, 2007. Dr. O'Neill prescribed hydrocodone. (Tr. 686). She was seen several times in 2008. The notes are very brief. On December 30, 2008, Dr. O'Neill wrote that she had "some pain from fibromyalgia." He prescribed Cymbalta. (Tr. 683).

Dr. O'Neill's records contain a letter from St. John's Mercy Medical Group, in St. Louis, Missouri, dated June 24, 2008. This letter states that plaintiff had recently agreed to participate in a clinical trial being conducted "on Fibromyalgia." (Tr. 873).

In February, 2009, Dr. O'Neill noted that she was "doing well at present." (Tr. 681). She was seen for Bell's palsy several times in March and April, 2009. This was "much better" on April 21, 2009. (Tr. 680-681). In May, 2009, Tramadol and Hydrocodone were refilled. On August 14, 2009, Dr. O'Neill noted that she was doing well. (Tr. 680).

On September 29, 2009, neurologist Stephen Burger examined plaintiff for a complaint of pain and fullness in her left cheek. He noted that her history included left Bell's palsy, hypertension, fibromyalgia, arthritis and obesity. She had swelling over her left cheek. Otherwise, her exam was normal. She had normal strength, bulk and muscle tone throughout. Sensory examination was intact. Coordination testing was normal. (Tr. 762-763).

10

Dr. Vittal Chapa performed a consultative physical exam on October 10, 2009. Neurological exam was normal. She had no joint redness, swelling or heat. There was no swelling of the legs. She had no paravertebral muscle spasms. Hand grip was full and equal, and she could perform fine and gross manipulations. She had a full range of motion. (Tr. 768-771).

On November 16, 2009, Gregory Rudolph, Ph. D., performed a consultative psychological exam. He found that her memory skills were intact. She was able to do simple calculations, to use judgment and to use reasoning skills. She presented with some depression and anxiety. (Tr. 782-785).

In December, 2009, and January, 2010, Dr. O'Neill noted abdominal pain which might be kidney stones. (Tr. 949).

She was seen by Dr. Vasantha Pai, who performed an EGD and colonoscopy. He diagnosed Barrett's esophagus and left-sided diverticulitis in March, 2010. (Tr. 1058-1063).

In May and June, 2010, her blood sugars were running high, and Dr. O'Neill recommended the 1800 calorie a day ADA diet. (Tr. 1143).

On a referral from Dr. O'Neill, plaintiff was seen by Dr. Edward Rose on June 7, 2010, for a confirmation of fibromyalgia. Dr. Rose noted that she had been enrolled in a study of Cymbalta for fibromyalgia a few years earlier at St. Louis University, and she had been taking Cymbalta since then. On exam, she weighed 242 pounds. Her joints had a normal range of motion. Dr. Rose stated that she had "tenderness of all classic fibromyalgia tender points tested and also all control points." He stated that she "carries a diagnosis of fibromyalgia which was

11

confirmed, presumably, at St. Louis University." He concurred in the diagnosis "given the 5-year history of generalized pain without other diseases showing." He did not recommend any further testing. Ms. Ruiz told him that she was applying for disability and that, on her bad days, she could not get out of bed because of pain. He stated that he had "no way of objectively ascertaining these limitations, but such problems are common in patients with fibromyalgia." He also stated that, in his opinion, she was "disabled due to this condition." He did not ask her to return for further treatment. (Tr. 1144-1145).

In July, 2010, Dr. O'Neill noted that her blood sugars were much better. (Tr. 1142).

Ms. Ruiz went to the emergency room for fatigue, light headedness, headache, dizziness, poor appetite, general pain, and feeling of edema and weight gain on September 25, 2010. A CT scan of the brain showed no intracranial pathology. The assessment was headache and dizziness. She was discharged and told to follow up with Dr. O'Neill. (Tr. 1129-1134).

Dr. O'Neill saw her in the office in September and October, 2010. He refilled her hydrocodone in October, 2010. (Tr. 1142).

Plaintiff was last insured for DIB as of December 31, 2010. After that date, she continued to be seen by Dr. O'Neill. At some point, Dr. O'Neill's office began making office notes on check-off forms. These forms included a place to record notes regarding the patient's psychiatric status. In 2011 and 2012, Dr. O'Neill either made no note regarding Ms. Ruiz' psychiatric status, or checked "alert, oriented to person, place & time." (Tr. 1217-1229).

12

### 3. Opinion of Treating Doctor

In May, 2010, Dr. O'Neill assessed plaintiff's limitations by completing a form. He indicated a diagnosis of fibromyalgia, and said that she could sit and stand/walk for less than 2 hours a day. She could walk only 1 block. She could occasionally lift 10 pounds, and had difficulty bending, twisting, lifting, kneeling and stooping. In addition, "emotional factors" contributed to the severity of her limitations, and she would be likely to be absent from work more than 3 times a month because of her impairments. (Tr. 1067).

Dr. Rose's opinion is summarized above.

## Analysis

Plaintiff's first two points arise out of a misreading of the ALJ's remarks at the hearings.

At the first hearing, the ALJ told plaintiff's representative that he would "possibly entertain a favorable [decision] in this case if you gave me something other than the 2007." The representative stated that he would have to check with the Shaw Group about amending the alleged onset date. (Tr. 91-92). Plaintiff's representative later wrote a letter to the ALJ in which he suggested an amended onset date of May 1, 2010, or June 1, 2010, but only if a fully favorable decision were to be entered. (Tr. 333). The ALJ's comment in no way committed him to find in plaintiff's favor, and does not present grounds for remand.

At the close of the second hearing, the ALJ said, "We're going to hold this for a supplemental hearing with an orthopedist, and a psychological [INAUDIBLE]." (Tr. 102). The ALJ stated that he was going to obtain additional expert testimony,

13

not that he was going to obtain additional examinations of plaintiff. At the third hearing, an orthopedic doctor and a psychologist did, in fact, testify as independent expert witnesses. This does not present grounds for remand. The Court notes that the ALJ had already obtained consultative physical and psychological examinations of plaintiff, and plaintiff does not present any reason to believe that additional examinations were warranted.

Plaintiff's third point arguably challenges the ALJ's weighing of the expert testimony. As was explained above, at the second hearing, Dr. Alan Kravitz testified that plaintiff's fibromyalgia equaled a listed impairment in the 1.00 series. However, at the third hearing, Dr. Malcolm Brahms testified that, in his opinion, plaintiff's physical condition did not meet or equal a listed impairment. Kathleen O'Brien, Ph.D., testified that plaintiff's mental condition did not meet or equal a listed impairment. The ALJ explained that he credited Dr. Brahms' testimony over that of Dr. Kravitz because Dr. Kravitz "did not know how many 'classic trigger points' the claimant had that would approximate a disability finding for fibromyalgia." (Tr. 29). In other words, Dr. Kravitz was not entirely familiar with plaintiff's medical records or with the agency's position on the assessment of fibromyalgia. The ALJ also considered the relative specialties of the two experts. (Tr. 30).

It is the function of the ALJ, and not this Court, to weigh the evidence and decide conflicts in the evidence, and this Court cannot substitute its judgment for that of the ALJ. *White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005). The ALJ was required to weigh the conflicting opinions using the criteria set forth in 20

14

C.F.R. §404.1527(a) through (d). See, §404.1527(e)(2)(iii). The ALJ gave valid reasons for choosing between the two conflicting opinions. Plaintiff has not demonstrated that he erred.

Ms. Ruiz next argues that the ALJ dismissed the third-party statements and the opinions of her treating doctors.

It is clear that, after the Appeals Council remand, the ALJ considered the third-party statements. He described them as "detailed, sincere, and sympathetic statements." However, he did not accept them as "proof of disability." He pointed out that the third-parties were not trained medical professionals, and that they were naturally influenced by their affection for plaintiff. Further, plaintiff's husband, mother and daughter had a financial interest in the outcome of the case. Most importantly, the ALJ noted that the statements were inconsistent with the medical evidence. (Tr. 28).

The ALJ was not required to uncritically accept the third-party statements. Rather, he was required to consider them and weigh their evidentiary value, along with the other evidence. 20 C.F.R. §404.1529(c). It is apparent that he did so here.

Lastly, plaintiff takes issue with the ALJ's weighing of the opinions of her treating doctors. She specifically mentions only Dr. Rose, but, in view of her *pro se* status, the Court construes her brief liberally to include Dr. O'Neill as well.

The opinions of treating doctors are to be evaluated under 20 C.F.R. §404.1527. Obviously, the ALJ is not required to accept a treating doctor's opinion; "while the treating physician's opinion is important, it is not the final word

15

on a claimant's disability." *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996)(internal citation omitted). If is the function of the ALJ to weigh the medical evidence, applying the factors set forth in §404.1527. Supportability and consistency are two important factors to be considered in weighing medical opinions. See, 20 C.F.R. §404.1527(d). In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010), citing §404.1527(d).

The ALJ must be mindful that the treating doctor has the advantage of having spent more time with the plaintiff but, at the same time, he may "bend over backwards" to help a patient obtain benefits. *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006). See also, *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985) ("The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.").

When considered against this backdrop, the Court finds no error in the ALJ's weighing of the treating doctors' opinion. Dr. Rose saw plaintiff only one time. He agreed that she had fibromyalgia, but pointed out that he could not verify her statement as to her limitations. He stated only that she was disabled. However, as the ALJ correctly pointed out, a treating doctor's statement that a patient is disabled is not a medical opinion and is not entitled to any special deference. §404.1427(d). ALJ Warzycki rejected Dr. O'Neill's opinion because it was not

supported by his treatment notes. The ALJ correctly concluded that Dr. O'Neill's office notes for the relevant period do not support the severe physical limitations set forth in his report. Also, he pointed out that Dr. O'Neill did not identify any objective medical basis for the limitations he assigned, and his opinion is inconsistent with Dr. Chapa's exam. (Tr. 193).

In effect, plaintiff is arguing for a *per se* rule that the opinion of a treating doctor is always entitled to controlling weight. As was explained in detail above, that is not the law. Further, plaintiff must demonstrate more than just a diagnosis of fibromyalgia to be found disabled. The question is not just whether she has fibromyalgia. The real issue is the effect of her fibromyalgia and other impairments at the relevant time.

Ms. Ruiz applied only for DIB. In order to prevail, she must show that she was disabled as of the date she was last insured for DIB, i.e., December 31, 2010. It is not sufficient to show that the impairment was present as of the date last insured; rather plaintiff must show that the impairment was severe enough to be disabling as of the relevant date. *Martinez v. Astrue*, 630 F.3d 693, 699 (7th Cir. 2011). She has not done so here.

In the final analysis, plaintiff's arguments are a plea to the Court to reweigh the evidence, which is far beyond this Court's proper role. The most that can be said is that reasonable minds could differ as to whether Ms. Ruiz was disabled during the relevant time period. In that circumstance, the ALJ's decision must be affirmed if it is supported by substantial evidence. And, the Court cannot reweigh the evidence or substitute its judgment for that of the ALJ in reviewing for

substantial evidence.   *Shideler v. Astrue,* 688 F.3d 306, 310 (7th Cir. 2012).

## Conclusion

After careful review of the record as a whole, the Court is convinced that ALJ Warzycki committed no errors of law, and that his findings are supported by substantial evidence.   Accordingly, the final decision of the Commissioner of Social Security denying Tami R. Ruiz' application for disability benefits is **AFFIRMED**.

The Clerk of Court shall enter judgment in favor of defendant.

**IT IS SO ORDERED.**

**DATE:   April 2, 2015**

                              <u>**s/ Clifford J. Proud**</u>
                              **CLIFFORD J. PROUD**
                              **UNITED STATES MAGISTRATE JUDGE**